Regents of the University of California, are the parties ready? I assume so. Let me, let me score away some of the housekeeping here. Mr. Blanton, you've reserved four minutes of your time for rebuttal. That's correct. And Mr. Nimrod, you have 14 minutes, and you have 15 minutes, but one of the, you, you reserved a minute for your cross appeal. Yes, sir. And then you'll respond with your four minutes, both to the cross appeal and also to rebut. Correct. Is that correct? Yes. Okay. We're all set. You may, you may start. Thank you, and may it please the court. The PTAB's decision in this case deems Broad the inventor, without ever identifying any inventive contribution Broad made. Because Broad, after receiving CVC's conception through Mayor Fooney, reduced to practice earlier. But the PTAB never found that more than inventive skill was required to reduce to practice for Broad or any of the other five labs that promptly reduced to practice after CVC's invention was announced. The PTAB reached that surprising result, finding someone to be the inventor without identifying anything, any inventive contribution, without finding any exercise of more than ordinary skill, because it applied the wrong legal standard in at least two respects. The first, on the standard of conception. Whether conception's complete depends on whether skilled artisans can reduce the invention to practice. Counselor, it seems to me that one of the primary issues dealing with conception in this case is the idea of reduction to practice. Does just the concept, the element of reduction to concept, what role does it play in conception? So, it doesn't, Your Honor, because reduction to practice is different from conception. Conception is having the idea of the invention. Reduction to practice is what the skilled artisan does once the idea occurs. So long as the conception's sufficiently complete, that a skilled artisan can reduce it to practice with ordinary skill, without further invention, the conception's complete. How do we know, for example, in this case, if it's complete, if there seems to be significant experimentation going on? Right, and the standard is, you can tell if it's complete, and I'm going to ask the court to turn to page 180 and 181 of the appendix to explain the error that occurred, but you can tell if it's complete if you see that only ordinary skill is required to reduce it to practice. If inventive skill is required, then obviously your invention was complete because further invention was contemplated. You need to do further invention. But if you can do it with ordinary skill, like Morgan Thaler says, it's ready for handoff to a skilled artisan without any further exercise of inventive skill, or Tanzl, ready for handoff to a skilled mechanic, or Dolbert, where Alexander Graham Bell couldn't reduce the telephone to practice, couldn't make audible sounds, but the fact that a skilled mechanic could meant that it was ready for patenting. So if you turn to page 180 of the appendix, I think this shows exactly what went wrong with the board's reasoning. The board says, and I didn't turn to 180 myself, but the board says, and this is where they're responding to our argument, they said, you could tell that ordinary skill, only ordinary skill was required. You could tell that our invention was complete because so many so quickly reduced to practice. And the argument they're responding to is on the line four to five, because reducing to practice and embodiment count one, quickly and easily, the CIDC inventors had a complete invention. But rather than say anything about what it took anybody else to reduce to practice, the board's response, or the PTAS response is, the Broad Inventors activities do not inure to the CVC, at least because CVC never submitted anything to Broad Inventors for testing. If you understand the standard, which is what's left for others to do, is it just the skill of a skilled mechanic, or is further invention required? That doesn't make any sense. We're not saying that somebody else's reduction to practice inures to our benefit. To what extent do you rely on subjective thought of the inventor? Subjective thoughts of the inventor, as Burroughs makes clear, doesn't matter. The inventor doesn't have to know it will work. And I think that was one of the fundamental mistakes. Having not looked at, on page 180, what was the skill required to reduce to practice? Instead, the PTAB went to, did you know it would work? Did the skilled inventor have, and I've got a blank page here. Did they really say that? Did you know that it worked? So page 155, or excuse me, 160, 162, it said the inventors needed a definite permanent idea of a system they knew would cleave DNA in eukaryotes. Or when they talked about the embodiment of micro-injecting zebrafish, they rejected our desire to reduce to practice that way because they were not persuaded that the inventors, quote, understood that reducing invention to practice in zebrafish required ordinary skill. Or page 179, failure to reveal uncertainty. I want to make sure that I know exactly what you're contending are the two errors. It sounds like the first error is that you contend that maybe there was some interlinking of the concept of conception reduction to practice. And for that, you were pointing to the 180 to 181 pages. Is that accurate? So I think that it's roughly correct.  Just correct me in the way you think it's inaccurate. The only modification I would make to that is that the PTAP simply didn't understand that when you're trying to figure out, is invention complete, the standard's an objective one. What does it take? Is it just what an ordinary skilled artisan would do in the ordinary course to reduce to practice? Or does it require further invention? It just didn't apply that standard. And you can tell it wasn't because it refused to look beyond the inventor's own efforts. I think 181 makes it also clear. Because if you're looking at 181, this is the explanation as to why our response to our argument that Broad used ordinary skill because they didn't do anything inventive. And the PTAP's response, and this is line eight, is Broad raises technical reasons why the Broad inventors had success when other eukaryotic CRISPR-Cas9 systems failed. So is that the subjective intent argument that you're making? I'm trying to understand how many errors you contend there are and where they link up in the decision. Right. I think there's multiple errors, but I think the basic one is not knowing that it was...not understanding it's an objective test of whether a skilled artisan can reduce it to practice. Because if you don't understand that, then Dolbert comes out the other way. Alexander Graham Bell loses. The other one is, instead of looking to that, the board, the PTAP, then went to, all right, we'll look at just what the inventors did, and we'll focus on their subjective intent. Did they know this would work? And that's a mistake as well. Everybody agrees that when it comes to conception, the inventor's idea of whether it's going to work is simply irrelevant. We agree that... Can I just ask you on that point? Because I struggle with some of our case law on this. And it looks like, and I'm talking in particular about Heitzman, and the board relied, I think, kind of heavily on that case. And at least, I read that case. It looks at the count or the claim and says the claim itself suggests that it's going to produce something. I don't remember the exact facts, but I'm sure you do. And then the board looks at this one and says the count requires that it's capable of doing something. And then says that there's nothing in that... By putting that language in the count, that shows the inventor had to know it was capable of doing something, which is... I don't know if that's the same as actually working, but it seems to me that's one way you can read the board's decision. Right. And I think Heitzman is all about whether or not that was a 20-nanometer particle. And when you claim the 20-nanometer particle, you have to know you can actually produce the 20-nanometer particle. So you don't know that you can actually produce what you're claiming. You're positing a solution, positing a problem, but you don't have in your hand the structure to solve the problem. This is the exact opposite, where we say, here is your structure. We have a CRISPR-Cas9 single guide, and it is your solution because it will leave. And we don't have to know it'll work because Burroughs tells us that. Because Burroughs... And your view is you don't have to explain how it's going to work because all that was done through routine experimentation and prior art techniques. I think that's exactly right. Whatever a skilled artist would have thought in advance, we understood, and the board makes this point at 148, that only the typical zinc fingers, talons techniques would be required. And in fact, we were right. The board seems to rely heavily on the fact that there was a lot of experimentation here and throws around the words, undo experimentation, which I think is true, which I find confusing if you don't have to show it to have conception. But is there a line there? It seems to me that there might be a line between routine experimentation performed by skilled artisans, which doesn't interfere with conception, and the type of experimentation that really is taking the idea and changing it and adding something new to it. And did the board find that the experimentation here by anybody added something new to your original CRISPR in eukaryotic cells? And the answer is no, and that's the mistake on page 181, because this is where we're responding. It's the paragraph beginning on line 5, where they reject the argument that Burroughs did not add anything inventive. They say, well, there's technical reasons why Burroughs succeeded by October 5 when others failed. And mind you, our claim to date was October 29. So like 25, 26 days later. And then they don't identify what those technical differences is. The board never says, hey, this was inventive. This is what made the difference. This is beyond routine or ordinary skill. And so hypothetically, what Broda did was say none of these prior art techniques work of getting your CRISPR thing into the DNA of the eukaryotic cell. And they came up with some kind of new method of inserting that CRISPR, whatever you call it, structure into the cell. And that's what they ended up claiming. Then you might not have conception. If there was, yes, if there was a further invention required, using routine skill that all the other five labs did that we eventually succeeded with as well within five months, if that was not sufficient, you needed further invention, that would be proof that we didn't have a complete thought. We needed further invention. Did Broda's experimentation go outside the lines of CLAIM-15? Is this what Broda also invented? Yes, so the elements of the count, what we claimed in the first instance and proposed reducing and what they reduced are all the same. And the question is, just is ordinary skill used required to reduce it? If so, the invention was complete when we conceived it. If more than ordinary skill is required, if you need invention, then it's not complete. And what you invent, and there's no dispute that you invented the CRISPR-9 in the generic environment, right? That's correct. And so the only thing at issue in this case is whether you invented it or had the conception of it for the eukaryotic cells, or did Broda do that? That's exactly right. What's your evidence that you had conception for eukaryotic before Broda? So the conception before Broda, we start with page 8 of our brief, which is actually from the lab notebook, which is back in March. You have the actual drawing of the single guide CRISPR-Cas9 system, and it says up in the corner, use in mammalian cells. And then as the board explained, this is on page 148, 149, we in our invention disclosure statement said, use ordinary techniques, ordinary talents to reduce the practice. And if you look at the invention disclosure statement, it walks through and talks about specific types of things that we are going to do, such as knockouts in model organisms, rats. That's at 65647. Therapeutic correction of disease-linked point mutation in human cells, 65648. It goes on and on about eukaryotic cells. And then if you look at page 13 of our brief, that shows by June, we've had this idea to reduce the practice in fish cells and human cells. And we're talking about the NLS that we were going to use, we're talking about the vectors that you use, talking about all those types of routine optimizations you use in order to reduce the practice. If I could turn very quickly to written description in the minutes I have left. Can I? Go ahead. I'd rather just ask you another question. Of course. Let's just... Go ahead, and I'm going to give you sufficient time to get into, given the amount of questions that we do have, we may go over a little bit of time. I'll adjust everybody's time accordingly. Let's assume we agree with you that the board, even though... It's this case I find very difficult, because throughout their decision, they cite the correct legal statements, it seems like. But then when they actually describe your arguments and why they fail, they seem to be applying a different standard. If we agree with you on the law, don't we still have to remand this because there's not enough factual determinations for us to reverse outright? Yeah, I think the standard is, unless this court can say with confidence there's only one possible outcome on remand, and frankly, I think we're there. But if you don't think we're there, then the answer would be the typical Idaho power and light, remand for further proceedings not considered. Let me just ask you one further question about this, because this is the one... I mean, on page 48 of their decision, which is page 161 of the appendix, at the top they say, we acknowledge CBC's argument that in the end, only routine materials and techniques were required so that it would work in eukaryotic cells. That seems pretty close to if you're applying the right legal standard to suggest that you're right. I think it is, if you apply the right standard, it is a concession that we're right. And the only question is, is that correct? And then the board's fundamental... Sorry, the other part of that sentence, and this is what's troubling, and I think they're relying on Heitzman for this, but I'm not sure that's correct, is we look to what the CBE and Sitter inventors understood as evidence of their conception, not others might have understood later. Yeah, and that... Where is that supported in the case law? I don't think it is, because remember, Burroughs is very clear that you don't have to understand it'll work. It was actually a path-marking invention used in the 80s, used AZT to treat AIDS. And the claim there was, apply a therapeutically effective amount. They didn't know AZT would actually treat AIDS. But because they had that concept, and it required only ordinary skill to reduce it to practice, to prove it works, they were the inventors. And I think that's the fundamental rule that they lost track of here, is that under Applegate and McMillan, you aren't the inventor simply because you prove that it works. You don't give the invention to the guy who tested it and proves it works, you give the invention to the person who had the thought. If I could turn very briefly to written description... Before you do... Okay. I know you want to get there, we're going to let you get there. Okay, that's why I'm here. I wanted to just do a few follow-up questions on what Judge Hughes asked you. So, if we agree that there's some errors in terms of the conception analysis, legal errors, and I think we've been talking through them, do we need to reach your arguments on APA errors in the conception analysis? No, the court doesn't necessarily have to reach them. Once this court identifies an error, it can vacate the decision and remand. But I think it would be helpful if the court identified the additional errors so the board would have the ability to fix them on remand, and we wouldn't have to come back here and argue those same errors again if the board repeats them in its reasoning. But that would be simply in the court's discretion, whether they think it would be useful and in favor of judicial economy to address additional issues, but the court wouldn't be required to do so. They would just burgle them back up if they became problematic errors again in the next decision. And now I'm going to give you a question that's going to let you segue to written description, which I think will make you happy. So, if we agree with you on conception but disagree with you on written description, what do you contend the overall disposition should be? So, if you disagree with us on written description but agree with us on conception, the court would vacate and remand for further proceedings in connection with conception. You can end up with different outcomes in this because they apply the standard of written description that isn't the standard of conception that isn't the ordinary standard. But I think this is the segue to try and convince you that you shouldn't affirm on written description, which you could also not reach. You could just reach conception. Is there any dispute that you ultimately reduce this to practice so that if you win on conception, you have priority? Well, I don't think it is disputable that we actually reduce to practice no later by October 29th or October 31 when that non-POSA first-year graduate student, Ms. Seleski, succeeded. But I don't want to... Is that another thing that the board might have to decide? I think that the board declined to address that issue and that would be something for the board to address. I mean, exactly, Your Honor. What do you think is the conception date, the priority date? So, we would give our conception date as no later than June of 2012. And that's because we rely on the invention disclosure form, the lab notebook, and also, just to make sure, to be absolutely after certain, the fact that Jinek had mapped out exactly how he wanted to reduce it to practice through micro-injection in zebrafish, through the vector expression in human genes using the particular promoters and vectors that he had described. Turning to written description... Before we go there, so let's go back to conception. This is a legal question. And we'll review that de novo. But when we look at some of the underlying facts and some of the factual findings that PTAB made, we can view that for substantial evidence, correct? That's exactly right. Conception is a question. I think that's where you start getting bogged down a little bit. You know, for example, the emails that went back and forth that showed that gives at least the basis for a legitimate argument to be made that conception had not taken place. If the board had looked at those emails and said, these emails show, in light of what everybody else did and all the other evidence, that this was not, this required more than ordinary skill, that ordinary skilled artisans had to further invent, that would be a different story for us. But what the board said instead is, oh, it shows that you weren't sure it was going to work, that subjective that you didn't expect it to work means that you don't have conception, and that's simply not the standard. The standard is, looking at the evidence, could a skilled artisan reduce this to practice? And the answer is skilled artisans without further skill, as page 161, could reduce it to practice without further invention. It was ready for the skill, handoff to the skilled mechanic. And what about the other organizations? There's five other groups or organizations that also were experimenting. Did they add anything to the invention? I don't think they did. And if you look at page 18 of our brief, there's a chart there showing what everybody did that was different. Everybody took what was the ordinary techniques that they were using at that point in time, for talons and zinc fingers, the sort of very similar use of proteins to do cuttings, but they didn't have the DNA component there. They just applied the same techniques that they'd been previously applying, and simply used those same techniques on CRISPR-Cas9, and achieved success in relatively short periods of time, which is precisely what we had thought would happen as the board said on page 148, that you would simply apply the standard techniques, and you would achieve success. And that is, in fact, what happened. I have one remaining question, but my colleagues may have more on this point. This notion about whether the inventor knows, or knew, or should have known, it seems to me that the PTAB lists add up out of the Burroughs case. And Burroughs is argued by both sides to attack the other side, and to support their position. How does Burroughs help you? So Burroughs, I think, is absolutely clear, and I think it says this on page 1228. I'm just going to quote. An inventor's belief that his invention will work, or his reasons for choosing a particular approach, are irrelevant to conception. I don't think you can get around that quote that says the inventor's beliefs are irrelevant. What you're looking at is, what did the inventor propose as their invention, and was further invention required, in which case it's incomplete? Or, could a skilled artisan take it, or in the words of Morgan Thaler, was it ready for handoff to a skilled mechanic? Was it ready for ordinary skill to reduce to practice? And that's why, for example, in acromed, the surgeon came up with a plate, but he didn't know how to keep it from sliding. So the machinist said, oh, use countersinks. Arcuate recesses. The surgeon had no idea how to do that. But he was still the inventor, because it was only ordinary skill, ordinary mechanical skill, to come up with the further idea of arcuate recesses. The same thing with Barba. Put the air conditioning unit up in the head, in the head area of the train car. That was the invention. They didn't have any idea of how to do it. But because it could be worked out by a skilled mechanic, it was a complete invention and ready for handoff. Okay, you're out of time, but we're going to restore you for a minute. Did you have a question? I promised him I'd let him get a word in on written description, so I don't know if he still wanted that word. I would beg for the word, but if you're too far, I don't want to strain the course of his patience. Thank you, Judge. Yes, let's hear about written description. All right, I'll endeavor to keep it really quick, which is that I think here, too, the PTAP just simply applied the wrong standard, because the provisional application doesn't have to convince skilled artisans that it's going to work. It doesn't have to walk through every conceivable barrier. What it has to do is it has to disclose the invention so people can understand what it is, what it is that you're claiming is your invention and describe it so they can see it. And critically, this is a compound claim. P1 explicitly describes the structure of your single-guy CRISPR-Cas9 system. There's a picture on page 653. That's the page 1 of the application. And on paragraph 73 to 154, it walks through and explains in detail, I might add, exactly what this is. And it's clear beyond capital that it's claiming it and describing it in a eukaryotic cell as well, and not just because it describes it as defining a host cell to include eukaryotic cells. If you look at paragraphs 124 and 127, 124 says that it's discussing appropriate vectors for eukaryotic health cells. The following vectors are provided for eukaryotic host cells, PTX1 strategy. Paragraph 127, suitable eukaryotic promoters, functional eukaryotic cell. Eukaryotic mentions outnumber prokaryotic 2 to 1. It's 8 to 1 if you just say it mentions a cell that turns out to be eukaryotic. And it's an original application. This is the old granddaddy original application. 21 claims specific to eukaryotic cells. You'd have to be willfully blind to not understand that they were describing and claiming CRISPR-Cas9 in a eukaryotic cell. And with that, I'll reserve whatever I have left for rebuttal. Thank you very much. Please, clerk. Mr. Nimrod, yes sir. Thank you, your honor. So just as an initial matter, there was no finding made by the PTAB that in the end, only routine materials and techniques were needed to make this work. Was there a finding the other way? That Zheng or any of the other people that worked on this contributed non-routine to the PTAB efforts to make this work? What they found was that you can't look at these techniques in isolation. Because there's not one technique. They focus on microinjection. Microinjection by itself didn't work. What you're looking at are adaptations. Okay, but you're not answering my question. Because I think the problem here for me is they're looking at the word experimentation which certainly appears in some of our precedent on this in a way that sounds to me not necessarily legally correct. If it's experimentation that shows you went beyond or made some kind of patentable modification to the conception then that's undue experimentation. But just using routine prior art techniques is not, right? Your honor, I don't think I'd agree with that for this reason. I don't want to quibble on that. Let's just assume that's right as a statement of law. That if the inventor conceives of something and that there are routine techniques to make it work that still doesn't disprove conception. So in this case the board would have to find that it was something other than routine prior art techniques. Did they make that finding anywhere? No, they did not make that finding anywhere, your honor. Is there any evidence of this? Yes, there is much evidence. There are 12 adaptations that our inventor made to the systems to make it work in eukaryotic cells. There were no... Techniques? No, there were no prior art techniques because there were no techniques known for making CRISPR work in the eukaryotic cell. He points to talons and zinc fingers which are protein systems. This is a protein RNA complex which is why, two things you have to put together there were no known techniques for how to make that work in the eukaryotic cell. In their brief they say we admit that only routine techniques were used and we said that we admit it below. The quote they go to is when we say he did not use routine techniques. They themselves point to 12 different adaptations that our inventor did to make this work. So your inventor invented the specific techniques to bring this into the DNA? Yes, he did, your honor. Where's the evidence for that? Not that it's just adapting a technique used in some other area to eukaryotic. It seems to me too narrow. Did he invent specifically new techniques of importing something into a eukaryotic DNA? He did that by using the techniques that he knew of from prior work he did in his own lab. He was not a poser, your honor. He'd been working on eukaryotic CRISPR for a year using dual molecule systems and he developed techniques in his lab. I think we're talking past each other. I'm not talking about specifically adapting CRISPR to a eukaryotic cell. I'm talking about the techniques underlying that adaptation. Are any of those new techniques that were invented for the first time by your inventor? Yes, I would say that is the case, your honor. Which ones are they? I can go through a list of them, your honor. It's the modifications to the vector, modifications to the promoter, modifications to a vector map. All those things are individual things that he put together that had never been done before. As I said, there's 12 adaptations. So the vector map had never been done before? Not for the CRISPR, your honor. That's where we're talking past each other. I don't think that that's the correct statement of the law. If you do, that's fine, you can push that. But if you have an idea, and they have an idea of, let's just assume that what they pointed to is sufficient to show this CRISPR structure and the idea of using it in a eukaryotic cell to cleave or whatever it is. That's their idea. It seems like there's no dispute that they invented CRISPR for the generic cell. For the single cell or whatever. The original CRISPR structure. The dispute is over whether they invented it for eukaryotic, right? I think the point is that there's no dispute that they conceived of sgRNA. The use of CRISPR in a eukaryotic cell was not their idea first. In fact, the evidence is in the record that in 2011 our inventor was using it for dual molecule RNA. So what they invented in 2012 was something called sgRNA which is one of two types of RNA that you can use in a cell. In fact, in the first appeal right now, this whole appeal is going forward in the way where the other side is saying sgRNA was it. That was the invention. Once you had that in the word eukaryotic, you were done. That was the point of the first appeal. The first appeal in this case, this court affirmed the PTAB's finding that sgRNA which they came up with it's a nifty RNA to use with CRISPR there's also dual molecule which we've been using before that that was not did not render the claim to have eukaryotic functionality obvious. They were patently distinct. Now we're just throwing that out saying, well no, if you use the word eukaryotic that's enough. Why is it not error that the PTAB refused to take into account evidence of other labs alleged success? Your Honor, they did not refuse to take it into account. So if I could just preface this a little bit we've been hearing and I'll get to this, Your Honor, just wanted to get the background here we've been hearing all about how the PTAB failed to make a finding that there was some inventive skill required. The standard that they proposed to the PTAB was the borough standard that said, they said quote, in their brief, their motion two conception is complete when only ordinary skill would be necessary to reduce the invention to practice without extensive experimentation or research. That's in appendix 66858 and then they went on in their motion two to say this, I think this is very important quote, there were no prolonged periods of extensive research experiment and modification or perplexing intricate difficulties that plagued the inventors, the CVC inventors, from their conception to their reduction to practice. So they were relying on their own work to say, look at our work, that confirms that we had a conception. So the PTAB took them up on that and did two things they analyzed CVC's own work and they made the findings we're talking about, which is quote, appendix 158 contrary to CVC's argument the argument CVC said, look to our inventors, it was easy for them we find that the CVC inventors engaged in a prolonged period of extensive research, experiment and modification. I think a real key word there is modification. I'm not sure if you answered my question. I was going to get to that Your Honor. Can we get there sooner? Sure, I'll get to that. I'm sorry. So they made these findings saying that their own research shows that they didn't have any plan and they went on and said time out, time out. Can we just take the answer to my question I know your time is running, I'd just love to get the answer just on these labs before we go back into your other argument. Right, so at appendix page 179 the PTAB made a finding, it didn't ignore the other labs at all it says, quote, regardless of any success by the Broad inventors the preponderance of the evidence presented by the parties demonstrates that the CVC inventors experimental failures reveal uncertainty undermining a definite and permanent idea of an sgRNA CRISPR-Cas9 system that edits or cleaves DNA in a eukaryotic cell. So they waited, they said, okay you told us to look at your own experiments and look at the Broad experiments, we've looked at both of them your own experiments show that you had no definite and permanent idea that you engaged, this is a fact finding a fact finding on a standard, they Well it's a fact finding if they're using the correct standard of law but if this is not the correct standard of law then these fact findings are not useful. But Your Honor this is the standard of law they told the PTAB to use. You know, he's going to get up and say that that's not what they said and we can read Burroughs for ourselves and determine what Burroughs says is the standard of law. I don't think that Burroughs says you can only rely on the inventors' experiments. I wasn't saying that, Your Honor. Well this is what the board says, we're not persuaded that these other inventors evidence inures to CDC. Your Honor, there's a couple reasons for that they looked at both, this is a wane of evidence, we've looked at which research were armed with CDC's plan. He says, well we had a plan to do these things that plan was not given to anybody but CDC and its collaborators and they failed every time they tried to do it and the important thing is, when they experienced failures, they didn't know what to do they had no plan. The case now is almost like, well we said they were eukaryotic and that's all we needed to say. Well I don't think that that's a very accurate representation of what they said. They have those lab notebooks they have all the other techniques they described you might be able to use sure their experiments took a long time and the board relied on those experimental failures but if the legal standard the board used is wrong the fact that they couldn't initially make it work doesn't mean that they didn't have the conception and that others used prior art techniques or were just skilled artisans making it work. My problem is, I understand you think that there's evidence in the record that shows there were techniques that went beyond a skilled artisan or aren't prior art techniques that Broad did. The board didn't make any of those findings. Your Honor, the board didn't make findings that weren't asked to be made I would say that, number one, but I will say this you mentioned, Your Honor, just by the skilled artisan so I want to get to the third party labs again. The board excuse me, CDC put in no evidence that any of the other labs were of ordinary skill. The board made an explicit finding, that's a fact finding, that the scientists performing the evidence the experiments for CDC were at least of ordinary skill and then they relied on those experiments to make a finding, a fact and the board then went on and looked at the third party labs and CDC did not put in any evidence whatsoever that those groups were of ordinary skill or that any of them were armed with CDC's plan. And to say that our inventor who'd been working in eukaryotic cells for a year with CRISPR, no one else he's not a POSA, he's got a year's worth of lab experience. So the board was free to say excuse me, appendix page 179, CDC attempts to shift our focus to the activities of other competing labs rather than the activities of its own inventors. We are not persuaded these other activities are evidence of CDC's inventors' ideas or their conception. So CDC didn't put in any evidence that they gave their plan to any of these other third parties. They put no evidence in that the board inventors were of only ordinary skill because... But they have to give them their plan. I mean there's the disclosures at the conference or whatever we're talking about, about the idea of using CRISPR in eukaryotic cells. If people can take that and run with it with prior art techniques, that doesn't undermine conception, does it? There's no evidence that people were able to... Yes, I would say yes it does. The reason it does, Your Honor, is because you have to have a conception of a complete and operative invention. And that's what you're looking to. They said, okay, try to... Let me ask you this then. Maybe you dispute that this is what they disclosed in those lab notebooks and stuff, but let's just assume what they disclosed was their CRISPR, the SGNRA or whatever it is you're talking about. I don't want to get into a debate about what that is. They disclosed that and they disclosed that it can be used in eukaryotic cells and that it can be done with prior art techniques. I don't take that as a factual matter, but for a hypothetical, let's just assume all that's true. That they had the conception of using the CRISPR in eukaryotic cells and that it could be accomplished with prior art techniques. If only prior art techniques were used to accomplish that, then didn't they conceive of the idea? No, I would say they did not, Your Honor. Why? Because to say simply that go try it, that was the whole point of the CBC, the first lawsuit here. I don't want to talk about the first lawsuit. I don't think it's an issue here. Okay. Your Honor, but all that is a disclosure of is a wish or a hope, which is what the PTAB found. They said all they had was a wish or a hope. One of the evidences they have is their invention disclosure form. They say, well, it was all there. Well, the PTAB made a fact finding about that. They said it in appendix page 148, line 13, quote, the IDF demonstrates that the CBC inventors planned to use their SGRNA CRISPR-Cas9 system in eukaryotic cells, but does not provide many of the details of how the inventors envisioned such a system would be operable. And that's what you need. You have to have a definite and permanent idea of an operable system. You can't just say go out and try routine techniques. That's not how it works. So the inventor needs to show or establish that it works? They have to have a definite and permanent idea of a system that they believe will work. We agree that that's not our law. We don't require that in order to have conception, the inventor must prove that the invention works. Okay. Your Honor. Is that correct? I would not agree with that in this particular situation. I'm sorry? I would not agree with that in this particular situation. Why not? Would you agree with it in another situation? Well, this gets down to the issue in the Burroughs case. Counsel just quoted you a page from Burroughs, page 1228, which has to do with the first five patents in that case. And if you read the Hitzman case, Your Honor, of course, it talks about the fact that Burroughs had six patents at issue. And it does have the quote about, that he read, regarding the first five patents. But the sixth patent in Burroughs required a function that was recited as a claim element, increased T-cell production. Like here, we have a claim element both halves of the count that requires functionality in a eukaryotic cell. And what the Hitzman court said was... Are you contending that this case is closer to the set of claims relating to a patient's T-cell levels, or closer to the set of claims that opposing counsel is talking about with using AZT to treat HIV? It's the effect in the T-cell production, right. Biological result. Why do you think that that's the closer, more analogous... Because in this case, it says, the CDC portion of the count says, quote, a eukaryotic cell comprising a target DNA molecule, and it goes on and says, whereby said system is capable of cleaving or editing the target DNA molecule or modulating transcription of at least one gene product encoded by the target DNA molecule, which is in the cell. And there was no dispute down below that, before the PTAP, excuse me, that that functionality was a claim element. That's one of the major problems with their patent is, in fact, a claim element. I could read a couple quotes from Hitzman. Hitzman is a case where there was a biological result that was required. And so Hitzman then goes on and explains, well, Erdogan said the first five patents, but then there was a sixth one that required a biological result. And Hitzman says at 243 F. 1354, quote, in establishing conception, a party must show possession of every feature recited in the count, and that every limitation of the count must have been known to the inventor at the time of the alleged conception. And in that case, there is this, there's a couple limitations that have to do with yeast and how they're functioning. But they're recited as claim elements. That's a key thing. It's not like the first five. It's recited as a claim element. There's no dispute here. It says only by, oh, I'm sorry. That's okay. Go back. I asked you a pretty simple question. And that is, do you agree that you don't have to show that an invention will work in order to have conception? You said yes and no. You gave me two. I think you have to know. You do have to know. Let me follow up with this question. Didn't the PTAB say that for this invention that the inventor should have known that the invention was going to work? And they did not. Okay. Can I answer on the law and then on what the PTAB did? Well, you're really out of time, but I'd like to have the answer to the question. The PTAB did not find that that was necessary for its decision on conception. What it did is it applied the Burroughs Standard. And it said that the Burroughs Standard allows us to look at the evidence of what happened after the alleged conception. It found that the IDF did not have enough in there to show an operative invention. It then made fact findings based on the evidence of what went back and forth in the e-mails saying not just that they failed and not the length of time, it's that the e-mails reflected the fact that they didn't have a plan. No, no, you're right. Actually, what it went to was the fact that they didn't have an idea. The documents they relied for conception are completely devoid of any real plan. So what they were doing, it's them that told the PTAB to look at what happened later. Let me ask you another question. This relates back to what we were talking about, but I'd like to see if I can get a little bit more of an answer. Let's just assume that I they conceived of this basic idea of doing CRISPR in a eukaryotic cell. I think you answered that Zheng, your inventors, whoever, added something that wasn't prior art techniques or something that was beyond the skill of artisan to the invention. But the board didn't make any fact findings on this. Do you have specific evidence in the record that points to what you think Zheng added to this invention? Well, yes, Your Honor. We have in our brief the different techniques that he applied that were not known to CDC and others. No, no, no, wait. I don't want to know not known to CDC or others. I want to know not known that they're not in the prior art and are not known to skilled artisans. Your Honor, our position is that none of them are known. No, no, no. I know what your position is.  And you very well represented your position. I'm just trying to figure out, if I have a different view of the law, what factual evidence is in the record to support the idea that even if CDC had CRISPR and eukaryotic cells that there was something beyond ordinary experimentation that was required to accomplish this and that in fact meant that Zheng is the inventor, not CDC. Your Honor, I would point your Honor to the adaptations that were made at Appendix 81091 and 81092 as examples and I believe in our brief we point out some of the other adaptations, for example, at um, no, I point you to those and there's more in our brief as well, Your Honor. Okay. But Your Honor, the Is that all? That's all. I'll give you two minutes if you want to address your cross appeal now. Your Honor, if I could just add just a couple more points on this. Uh, make it very brief. I just want to read the one quote from Hitzman I didn't get to, which is the Hitzman court says, quote, only by demonstrating that he had a definite and permanent understanding as to whether, as to whether, and how the yeast would produce the 20 nanometer particles could Hitzman establish conception of the particle size and sedimentation rate limitations prior to reducing the invention of practice. That's at 243 F3rd 1356. So the Hitzman court is explaining that if you have a functional claim element, you have to know how to make it work. But as I said, that argument, that statement by the PTAB actually was one where they were simply rejecting CVC's argument that it could ignore the functional claim element entirely. They had already found that there was no conception because of the prolonged period of extensive research and modifications. While they say now that everything was known, if you look in the appendix, the PTAB's decision at pages 152 to 156, you'll see they say code atom optimization was always in the plan. The PTAB cites an email from the inventor saying we're not sure, even in October, whether to use code atom optimization. They say our sgRNA never changed. The PTAB cites the email saying no, you tried all these different sgRNAs. sgRNA is not just one thing, it's a category of different ones you can try. I think we have that. I just have one question on the cross appeal. If we agree that resolving the claim construction issue would leave the PTAB's decisions on motions 2 and 3 intact, would you contend it's the right disposition here? I'm sorry. If we agree that resolving the claim construction issue would leave the PTAB's decision on motions 2 and 3 intact, what is the correct disposition here, in your opinion? Just on the cross appeal, Your Honor? Yeah, I'm asking you a question strictly on the cross appeal. On the cross appeal, I think we also have established that there were claims that were to generic RNA, it was a dual-molecule, single-guide and generic, whether or not you interpret guide RNA that way, so we think it still should be sent back with instructions to consider whether to broaden the count to include both dual and single-guide RNA. Were your claims mooted? Excuse me? Was the cross appeal mooted by the PTAB in reaching different motions and different motions? It was mooted in the sense that since there was no conception, it didn't matter. Since CBC, we were the first to produce the practice, it was mooted for that reason. Yes. Okay. Thank you, Judge. We restored you back to four minutes. Thank you. Very much appreciated. Can I just jump in? Before we got to the cross appeal, he was talking and we talked a little bit about this, but I want to go back to this because I find this the most troubling aspect of the cases. Our Hitzman decision, which suggests that when you have some kind of language in the claim or the count that suggested it's capable of working or it's operative or it will produce a result, that you have to have conception of that at the beginning and the board made a finding here that you didn't. Whether Hitzman is right or not is irrelevant. We have to follow it. What's your response to the notion that even though you had let's just assume, I know you'll agree with this, but let's just assume you had the idea of using CRISPR and eukaryotic cells with prior art techniques of getting it into the DNA. We agree that you had that, but that Hitzman requires something more, that you knew it was capable of cleaving. What evidence is there in the record that shows you knew it was capable of cleaving, which is the language in your claim? Or how would you deal with Hitzman? I think Hitzman is very different. Hitzman was a claim to a 20 nanometer particle. Part of conception is one, do you have the conception, do you have the idea? The other part is, do you have means for reducing it to practice? Can you build it? In Hitzman, the problem was they didn't know how to build that 20 nanometer particle. They didn't have that idea. I think Burroughs makes very clear, and Hitzman builds on Burroughs, you don't have to know it's going to work. I'm sorry to interrupt you, but your time is short. So is your view, Hitzman, what they didn't have was routine prior art techniques to get from their idea to the 20 nanometer thing you're talking about? Exactly. Further invention was required. I know opposing counsel says, there's five claims and there's a sixth claim in Burroughs, but the problem in Burroughs with the sixth claim, the five claims all talk about treating AIDS, therapeutically effective amount, and they just didn't know that AZT in the 1980s was going to be therapeutically effective. There was a sixth claim that talked about raising T-cells. The problem there was there was no evidence that they conceived that T-cells were linked. The T-cell increases would be linked to treating AIDS. There was a remand saying, did you think about the T-cells in particular, or is that something you came up with later and added to your account? Here we don't have any questions about what was being thought. We know that they were looking at eukaryotic cells. We know they specifically So the other question I discussed with your friend centered on the boards. I think we agree that there's no finding from the board that one way or another of whether the other experimenters used other than prior art or just skilled artisan techniques. Did you argue to the board either that they were just skilled artisan techniques or respond on why they did that, basically? If we send it back, I'm a little worried that there's nothing in the record one way or the other to the board Certainly we did, and we invoked not only that Zain did not innovate, and for that I would point to 81090 Zain did not innovate. He used ordinary skill routine techniques to reduce CBC's invention to practice further confirming CBC's prior conception was complete. That's the argument. He didn't innovate. Only ordinary skill was required. Therefore our conception is complete. In terms of the other labs I would go to page 66888. It says Third-party implementations of the inventor's sgRNA CRISPR-Cas9 system further corroborates the inventor's conception such that ordinary skill was needed to reduce the invention to practice. 85657 Multiple lab groups used CBC systems with only ordinary skill and routine techniques further confirming CBC's conception. We repeatedly went and pointed right to the other labs. We repeatedly pointed to the fact that Zain did not actually innovate and said that confirms that our techniques, our conception was complete. I know that there's been extensive argument that Zain did innovate in some way and we've responded in our brief on pages 21 to 23 in the reply to explain why that's not true. But the key thing is if you look at page 181, and this is the board's reasoning, 181 in the appendix, what does the board say? The board says, well there are technical reasons potentially why Zain succeeded before others did. By October 5 they said when our claimed reduction was the 29th or 31st of October. But it doesn't tell you when they are. It just simply says because there was failure on one hand while there were successes on another, there must have been differences. Well are those differences ordinary skill or are those differences inventive capability, inventive effort? And that's a question for the board. That is in the end a question for the board. We think there's only one answer. We've argued below that everything that Zain did was ordinary skill. These are just ordinary vectors, precisely the types of promoters ordinary field artisans would do. But that would be something for the board on remit. If there are no further questions, I would like to sit down. Sir, I could talk about the cross appeal very quickly. I think the fundamental problem with the cross appeal is they're appealing Motion 2 and Motion 3. But for each of them there was an alternative ground that isn't addressed in the opening brief. Do we have to address any of this if we remand to the board on this legal standard issue? I don't think the court necessarily has to. I think they would have the possibility of renewing it. But in the end, I think that it's all waived because the opening brief simply doesn't address the alternative ground for denying Motion 2, that they tried to make other changes to the count and didn't justify it, which was described as an independent ground for denial. And on Motion 3, the board said you haven't explained why the disclosure of CRISPR-Cas9 single guide wouldn't make obvious the generic invention, and therefore you haven't met the justification for deconsolidation. Thank you. If there are no further questions, I appreciate the question. Thank you. We'll rest on the briefs on our cross-bill once you have questions. We thank you, counsel, for that. We thank the party for the arguments this morning. We'll take this case under advisement.